738 So.2d 544 (1999)
ESTATE OF Gaston PATOUT and Roy Patout
v.
The CITY OF NEW IBERIA, Louisiana.
Squirrel Run Investment Group, Inc.
v.
The City of New Iberia.
No. 98-C-0961.
Supreme Court of Louisiana.
July 7, 1999.
*546 Charles J. Foret, Briney & Foret, Lafayette; Allyson Claire M. Edwards, James Michael Garner, McGlinchey Stafford; Keith Alex Kornman, Martha Young Curtis, Scott R. Hoyt, Thomas D. Boyle, Ralph Shelton Hubbard, III, Loree Peacock LeBoeuf, Lugenbuhl, Burke, New Orleans; Counsel for Applicant.
Porteous Richard Burke, Burke, Cestia, New Iberia; Paulin J. Laborde, Jr., Counsel for Respondent.
CALOGERO, Chief Justice.[*]
We granted writs in this case to determine whether lawsuits filed by the plaintiffs, the Estate of Gaston Patout and various Patout family members ("Patouts"), and the Squirrel Run Investment Group, Inc. ("Squirrel Run"), for damages arising from the unauthorized dumping of trash on their land by the City of New Iberia, are governed by the two year prescriptive period of La. R.S. 9:5624, the three year prescriptive period of R.S. 13:5111, or some other prescriptive period. Both lower courts concluded that because the damages incurred by the plaintiffs were not a "necessary consequence" of the City's landfill operations, R.S. 9:5624 is not applicable to plaintiffs' claims. We agree, and also conclude that the application of R.S. 13:5111, argued for the first time by defendants before this Court, is improper. Therefore, we find plaintiffs' causes of action to be governed by the one year general prescriptive period for delictual actions. Having so resolved the questions which triggered the granting of this writ application, we affirm the holding, and the judgment, of the court of appeal.

Facts
This dispute arises from landfill operations conducted by the City of New Iberia from 1970-85. In 1970, the City leased a tract of land from Lloyd Viator, adjacent to property owned by the Patouts and the predecessors of Squirrel Run, for use as a solid waste landfill. Over the course of the next fifteen years, trash was dumped and pushed well beyond the boundaries of the leased premises and onto the respective properties of the Patouts and Squirrel Run's predecessor in title. Unrefuted testimony established that this unauthorized dumping usually occurred when the access road to the dump site became muddy and wet, making the rear of the landfill inaccessible. Bulldozer operators would travel as far back as they could on the wet road and push the trash they carried beyond the unmarked boundaries of the landfill and into the dry or drier areas located on the plaintiffs' properties. By 1985, when the City turned over landfill operations to a private company and the unauthorized dumping ceased, approximately thirty acres of plaintiffs' property were covered with solid waste.
The Patout plaintiffs concede that they were aware of the unauthorized dumping as of December 31, 1975. Squirrel Run admits knowledge of the trespass upon their property beginning in May, 1975. During the late 1970's and early 80's, representatives of both groups of plaintiffs communicated several times with city officials about the trash problem. During a meeting at City Hall on February 24, 1982, representatives of the City and the owners of the damaged property confected a "Memorandum of Agreement," in which it was agreed that the trash had been placed on plaintiffs' properties in error and that steps would be taken to rectify the problem.
Despite this agreement, City employees continued to place solid waste on plaintiffs' property without permission until 1985, when landfill operations were turned over to Waste Management, Inc. It is uncontested that during the following three years of operation under Waste Management there was no unauthorized dumping *547 on plaintiffs' land. The facility stopped receiving waste at some point between late 1989 and mid-1990. The Louisiana Department of Environmental Quality accepted closure of the site in June 1993, subject to three years of post-closure monitoring. The Patouts and Squirrel Run filed lawsuits against the City, later consolidated for trial, on January 28, 1992 and November 9, 1993, respectively.

Proceedings Below
Plaintiffs filed lawsuits against the City of New Iberia and its former liability insurers alleging trespass, and seeking general and special damages. In addition, Squirrel Run sought abatement, interpreted by the trial court as a request for injunctive relief. The City and its insurers filed numerous exceptions, and asserted defenses, including a peremptory exception of prescription based on the two year prescriptive period provided for in La. R.S. 9:5624. That statute relied upon by the defendants, enacted by Act No. 421 of the Louisiana legislature of 1950, provides that:
When private property is damaged for public purposes any and all actions for such damages are prescribed by the prescription of two years, which shall begin to run when the damages are sustained.[1]
A pre-trial hearing on the exception was held June 28, 1996. The trial judge, in his reasons for judgment and supplemental reasons, concluded that all of plaintiffs claims arising after February 23, 1981 were prescribed, while those arising before that date were not. In reaching this conclusion, the trial court first reasoned that La. R.S. 9:5624 was not applicable to any of plaintiffs' damage claims. Finding that the damage allegedly sustained by the plaintiffs must be a "necessary consequence" of the operation of the landfills in order for either version of the statute to be triggered, and concluding that the unauthorized dumping was not such a necessary consequence, the trial court rejected the defendants' argument that R.S. 9:5624 is applicable in this case, citing Miller v. Colonial Pipeline, 173 So.2d 840 (La.App. 3rd Cir.1965) and this Court's decision in Angelle v. State, 212 La. 1069, 34 So.2d 321 (1948). Instead, the trial court concluded that plaintiffs' claims were subject to the one year prescriptive period applicable to delictual actions under Louisiana Civil Code articles 3492[2] and 3493.[3]
Although plaintiffs' claims appeared to have been prescribed, the trial court concluded that the 1982 memorandum of agreement constituted a renunciation by the City of accrued prescription. La. C.C. art. 3449; Lima v. Schmidt, 595 So.2d 624 (La.1992); Board of Levee Comm'rs v. Newport, Ltd., 517 So.2d 406 (La.App. 4th Cir.1987). Because prescription can be renounced only after it has accrued, the trial court reasoned that the memorandum served to renounce prescription for those claims which had prescribed by February 24, 1982, the date of the agreementin other words, all claims arising on or before February 23, 1981 were subject to the renunciation and had not *548 prescribed.[4] As for plaintiffs' claims arising after February 23, 1981, the trial court concluded that there was "no evidence that the court found credible or reliable to indicate that there was an interruption or suspension or renunciation of prescription... by the City ... after the first agreement dated February 24, 1982," so that any claims for trespass not renounced by the agreement were prescribed.
The Third Circuit Court of Appeal affirmed in part and reversed in part, finding all of plaintiffs' claims to be viable. Estate of Patout v. City of New Iberia, 97-1097 (La.App. 3rd Cir. 3/6/98), 708 So.2d 526. In reaching this conclusion, the court of appeal first agreed with the trial court that R.S. 9:5624, the two year prescriptive period for claims regarding private property damaged for a public purpose, was not applicable to plaintiffs' lawsuits, as the damage sustained by plaintiffs was not a "necessary consequence" of the landfill operation, citing this Court's decision in Lyman v. Town of Sunset, 500 So.2d 390 (La.1987). The court of appeal relied on the testimony of plaintiffs' expert civil engineer, who opined that, had the City marked the boundary of the leased property and constructed a proper access road, it would likely not have mistakenly placed garbage on neighboring property. The City's argument, that the inaccessibility of the landfill when the access road was wet made the pushing of trash onto the neighboring property a necessary consequence of the landfill operation, was rejected. The court of appeal concluded that the City's trespass "had nothing to do with the necessary and proper operation of the landfill, but was caused solely by the negligence of the City's employees or agents." Estate of Patout, p. 7, 708 So.2d at 530. Finding R.S. 9:5624 to be inapplicable, the court of appeal next reasoned that the continuous nature of the act of trespass and damage committed by the City constituted a continuing tort, so that prescription could not have begun to run until the offending acts were abated, citing South Central Bell Telephone Co. v. Texaco, Inc., 418 So.2d 531 (La.1982); W. Page Keaton et al., Prosser and Keaton on the Law of Torts, § 13, at 83 (5th ed.1984). Because the offending trash had remained on plaintiffs' property, the court of appeal concluded that the one year prescriptive period of articles 3492 and 3493 had not yet begun to run.
The defendant City of New Iberia and its insurers sought writs in this Court, urging two assignments of error. First, defendants argue that the lower courts erred in finding R.S. 9:5624 inapplicable to plaintiffs' claims. Secondly, and in the alternative, defendants contend that, because the City's conduct constitutes an appropriation, not a tort, plaintiffs' claims are governed by the three year prescriptive period for takings found in R.S. 13:5111, which period is unaffected by any continuing trespass. They have not assigned as error, nor presented argument in opposition to the court of appeal's final conclusion that plaintiffs' lawsuits, if governed by the general one year prescriptive period, are viable because the presence of the misplaced trash constitutes a continuing tort. We granted writs to consider the issues that were raised by the defendantsnamely, whether the lower courts erred in finding R.S. 9:5624 inapplicable to plaintiffs' lawsuits, and whether, alternatively, these lawsuits are governed by the three year prescription of R.S. 13:5111.

Applicability of R.S. 9:5624
The question before us is whether plaintiffs' causes of action are subject to *549 the two year prescriptive period found in La. R.S. 9:5624, the one year prescriptive period of Civil Code articles 3492 and 3493, or some other prescriptive period.[5] Plaintiffs have alleged damage to their private property as a result of the operation of a public landfill, so that R.S. 9:5624, which purports to govern "any and all actions" when "private property is damaged," certainly seems applicable here, as opposed to the more general delictual prescriptive period found in La. C.C. art. 3492. It is well settled in Louisiana that when conflicting statutes are applicable, the one more specifically directed to the matter at issue trumps the more general statute. Smith v. Cajun Insulation, Inc., 392 So.2d 398, 402 (La.1980); Esteve v. Allstate Ins. Co., 351 So.2d 117, 121 (La.1977). However, not every lawsuit for damages caused by a public entity or involving a public works project falls within the purview of R.S. 9:5624. As the statute states, the damages suffered must be incurred for "public purposes" in order to trigger the statute's application.
The most recent statement by this Court on the issue of the application of R.S. 9:5624 can be found in Lyman v. Town of Sunset, 500 So.2d 390 (La.1987). In Lyman, a real estate developer sued the Town of Sunset, among others, alleging that the existence of a nearby landfill diminished his property's value and decreased public interest in his land developments. Finding R.S. 9:5624 to be more specifically tailored to this situation, we applied the statute's two year prescriptive period, rather than the general one year period provided in Article 3492. We noted that the previous court of appeal cases in which the statute was applied involved damage that was a "necessary consequence" of the public work. Without extensive discussion, we then commented that the case at hand, too, involved damage that was a necessary consequence of the landfill operation, so that "[c]learly R.S. 9:5624 applies." Id. at 393.
The "necessary consequence" language briefly touched upon in the Lyman opinion is derived from a long line of court of appeal cases which have imposed the requirement that damage be a necessary consequence of the public work in order for R.S. 9:5624 to apply. See, e.g., Summerville v. Missouri Pacific R.R. Co., 509 So.2d 639 (La.App. 3rd Cir.1987); Oswalt v. Irby Construction Co., 424 So.2d 348 (La.App. 2nd Cir.1982); Boudreaux v. Terrebonne Parish Police Jury, 422 So.2d 1209 (La.App. 1st Cir.1982); Perkins v. Simon, 265 So.2d 804 (La.App.3rd Cir. 1972); Florsheim v. Dept. of Highways, 201 So.2d 155 (La.App.2nd Cir.1967); Miller v. Colonial Pipeline Co., 173 So.2d 840 (La.App. 3rd Cir.1965). These cases can be traced back to a 1948 decision by this Court, Angelle v. State, 212 La. 1069, 34 So.2d 321 (1948), in which the "necessary consequence" language first appears.
The plaintiffs in Angelle, owners of sweet potato crops and a Carencro rail-road station, filed suit against the State of Louisiana and the Department of Agriculture and Immigration for recovery of their respective losses caused by an accidental *550 fire that began while the State was spraying the sweet potatoes stored at the railroad station pursuant to a state program for the eradication of insects. The state asserted a defense of sovereign immunity, pointing out that the sovereign could not be sued in its own courts without the consent of the legislature.[6] To get around this problem, the plaintiffs came up with a novel theorythey argued that the destruction of their property was an appropriation of the property for a public purpose, as provided in Article I of the Louisiana Constitution, so that compensation was due, and consent of the sovereign was not required. At the time, Article I, Section 2, of the Louisiana Constitution declared in pertinent part that, "Except as otherwise provided in this Constitution, private property shall not be taken or damaged except for public purposes and after just and adequate compensation is paid."
It then became necessary for the Angelle court to determine the meaning of this constitutional prohibition against the taking or damaging of private property "except for public purposes." The Court concluded that:
... [W]e view the constitutional provision as applicable only to cases where the taking or damaging of the private property is intentional or occurs as a necessary consequence of the public undertakings. We say "necessary consequence" because we envision cases where damage might be inflicted upon private property as a necessary result of the undertaking although the doing of the damage is unintentional and may not be foreseeable by the governmental agency. In such matters, the damage is on a parity with the intentional taking or damaging under the power of eminent domain. On the other hand, damage to private property which occurs solely as a result of negligence and not as a necessary consequence of the public work, fits nowhere within the realm of eminent domain and the courts are without jurisdiction to entertain a suit of this sort against the sovereign. Id. at 326. (emphasis added)
The Court recognized a distinction between "the destruction and damaging of private property by agents of the State while engaged merely in the performance of a governmental function" and "the deliberate taking or necessary damaging of property for the public use and benefit." Id. at 323. According to the Court:
In the first instance, the destruction or damage occurs not for a public purpose but by reason of the negligence of the state officers or agents. In the latter, the property is taken or damaged under the power of eminent domain; it is an appropriation for public purposes ... Id.

Because the fire that destroyed plaintiffs' property had been caused by the negligent operation of a leaking wooden gasoline truck which often backfired and emitted sparks, the Court reasoned that the real basis for the asserted liability of the state was the tortious and negligent conduct of state agents, and not appropriation of private property by the state. The Court noted that the damage had resulted from a fortuitous event, a fire, and was "a wholly unintentional destruction which served no public purpose whatever." Id. at 323. Thus, the Court concluded, the accidental destruction of the plaintiffs' property by fire was not "for a public purpose," pointing out that "the mere fact that the fire occurred whilst the agents were engaged in performing a public duty was an incident wholly disconnected with *551 the object of the Department of Agriculture's program." Id. at 327.
Two years after the Angelle decision, the legislature enacted R.S. 9:5624, creating a two year prescriptive period for damages to private property incurred "for public purposes." Acts 1950, No. 421, § 1. Lower courts, beginning with the Third Circuit Court of Appeal in Miller, 173 So.2d at 840, looked to the language of Angelle for an interpretation of the term "for public purposes," as used in R.S. 9:5624. See also, Wilson v. City of Baton Rouge, 96-0015 (La.App. 1st Cir. 11/8/96), 683 So.2d 382; Small v. Avoyelles Parish Police Jury, 589 So.2d 1132 (La.App. 3rd Cir.1992); Roberts v. Murphy Oil Corp., 577 So.2d 308 (La.App. 4th Cir. 1991); Summerville, 509 So.2d at 639; Boudreaux, 422 So.2d at 1209; Oswalt, 424 So.2d at 348; Perkins, 265 So.2d at 804; Florsheim, 201 So.2d at 155. Particularly, the lower courts have focused on the "intentional or necessary consequence" requirement espoused in Angelle in order to determine what is, and what is not, "damage for public purposes," so as to trigger the application of the statute's prescriptive period.
In Miller, 173 So.2d at 840, the tenant of a rice farm filed suit against a pipeline construction company, alleging that his irrigation levees had been destroyed and the level of his land altered during the construction of the pipeline. Additionally, plaintiff sought damages for the death of three cows that escaped and died after becoming bogged down in the pipeline right of way. At issue in that case, as in the matter currently before us, was whether the two year prescriptive period of R.S. 9:5624 governed the plaintiffs lawsuit. Citing this Court's interpretation of the term "public purposes" in Angelle, the court concluded that the plaintiffs land had been damaged "as an intentional and necessary consequence of the construction of the pipeline," so that R.S. 9:5624 was indeed applicable. Id. at 845. However, the court concluded that the statute did not apply to plaintiffs claims for damages arising from the death of the cows. The court reasoned that the animals were not damaged for a public purpose because "[t]heir destruction was not intentional nor did it occur as a necessary consequence of the construction of the pipeline. It occurred solely as a result of the negligent acts of defendant's employees." Id.
In Florsheim, 201 So.2d at 155, R.S. 9:5624 was applied to a plaintiffs suit for property damages arising from the excavation and pile driving accompanying a state highway construction project. The second circuit court likened the plaintiffs damages to the damaged farmland in Miller, concluding that the cracking and erosion of the plaintiffs property was a necessary consequence of the construction project. A similar conclusion was reached by the first circuit in Boudreaux, 422 So.2d at 1209, involving a lawsuit for damages resulting from the unauthorized construction of a drainage canal and levee on the plaintiffs property, built as part of a police jury project to protect adjacent land from tidal overflow.
Lower courts finding R.S. 9:5624 inapplicable (i.e., concluding that damage was not incurred "for public purposes") have generally focused on the negligent acts or omissions of the defendant or its agents, concluding that such negligence precludes the application of the statute. For example, in Perkins, 265 So.2d at 804, the third circuit refused to apply R.S. 9:5624 to a lawsuit against a contracting company hired to construct a public housing project. Plaintiffs sued for flood damages caused after the defendant's employees broke a fire hydrant, as well as damage to a fence and shrubbery caused when an employee drove heavy equipment onto one plaintiffs property. Concluding that these negligent actions by the defendant's employees were "not necessary or intended," the court of appeal declined to apply R.S. 9:5624. See also, Summerville, 509 So.2d at 639 (concluding that flood damages allegedly resulting from a railroad *552 company's negligent failure to provide and maintain adequate drainage facilities, were not the "necessary consequence" of the railroad's track construction); Roberts, 577 So.2d at 308 (concluding that R.S. 9:5624 was not applicable because it was not necessary or intended that the public drainage system at issue be altered so as to cause flooding of plaintiffs' property during normal rainfall).
However, negligence on the part of the defendant public entity or its agents/employees has not always precluded the application of R.S. 9:5624 by the lower courts. For example, in Oswalt, 424 So.2d at 348, the plaintiff, a rice farmer, alleged that the defendant, a power line construction company, negligently crossed his rice fields with track vehicles, causing breaks in water retaining levees. Comparing the case before it to that of Miller, the second circuit concluded that "the public purpose work which caused the damage was intentional and necessary and it matters not for purposes of determining the applicable prescriptive period that the work was done in a negligent manner or that the full extent of the damages might have been unintentional." Oswalt, 424 So.2d at 352. Similarly, in Small, 589 So.2d at 1132, the Third Circuit Court of Appeal applied R.S. 9:5624 to a lawsuit alleging damage due to the negligent operation and maintenance of a sewer system. See also, Wilson, 96-0015, 683 So.2d at 382 (applying R.S. 9:5624 to property owners' action against city and parish for alleged negligent failure to maintain and repair drainage canal). Other lower courts have applied R.S. 9:5624 with no discussion whatsoever of the "necessary consequence" requirement. See, LeBlanc v. City of Lafayette, 558 So.2d 259 (La.App. 3rd Cir.1990) (applying R.S. 9:5624 to a lawsuit for damages arising out of the problems associated with a landfill adjacent to plaintiffs' properties, including odors, flies, loose trash, noise, drainage interference and other nuisances).
The defendant City of New Iberia and its insurers argue that the court of appeal erred in improperly applying the "necessary consequence" language of Angelle and its progeny. Defendants contend that the court of appeal has imposed an additional, subjective requirement by equating "necessary consequences" with "proper methodology," "proper operation," "due care," "need," and "legitimate" actions. In so doing, defendants argue, the court of appeal has emasculated R.S. 9:5624 and made it nearly impossible for a public entity to avoid a stale claim without a full trial on the merits. They further contend that the lower court should have focused on the purpose of the project, rather than whether the "proper" method was used to complete or operate the project, citing Oswalt, 424 So.2d at 348 and Wilson, 96-0015, 683 So.2d at 382. To require such "proper" methodology will preclude the application of R.S. 9:5624 to most tort claims, allege the defendants, because in most instances damage does not occur if a defendant acts "properly." Defendants contend that the dumping occurred as part of the City's regular operation of the landfill, so that the resulting damage was a "necessary consequence" of the City's operations.
Plaintiffs respond that it was patently unnecessary for the City to trespass on their properties, citing the testimony of their civil engineering expert. According to the plaintiffs, the City's argument would require the courts to conclude that all damage to private property is a necessary consequence of a public project, regardless of how it occurred. The plaintiffs adopt the court of appeal's conclusion that the City was negligent in its operation of the landfill, thus precluding the application of R.S. 9:5624.
Although our decision in Angelle dealt with questions of sovereign immunity, which are not at issue in this case, that opinion is helpful when interpreting the language that is common to the constitutional provision at issue in Angelle and the prescriptive statute currently before us *553 namely, the requirement that damage be incurred "for public purposes." As outlined in Angelle, damage is inflicted for a public purpose when the damaging is "intentional or occurs as a necessary consequence of the public undertaking." 34 So.2d at 326. To impose this "intentional or necessary consequence" language upon R.S. 9:5624 does not alter the statute or create a subjective requirement not contemplated by the legislature. Rather, it aids this Court in the determination of whether the damage complained of qualifies as damage "for public purposes."
We turn first to the question of whether the damage suffered by the Patouts and Squirrel Run was intentionally inflicted. Joseph Maturin, a city bulldozer operator who worked at the landfill site, testified at the hearing on prescription that he made a unilateral decision to push garbage off of the access road when rainy weather made the rear of the leased landfill area inaccessible, unaware that, as a result, garbage was being pushed onto the plaintiffs' properties.[7] He was not aware at the time that the fence bordering the landfill access road marked the boundary of the Squirrel Run property. Mr. Maturin was told by a City bookkeeper of one complaint received from a member of the Patout family, but was not instructed to change his behavior. Neither plaintiffs nor defendants have suggested that the garbage was knowingly and intentionally placed on plaintiffs' land. Instead, it appears undisputed, at least in the record, that the City's trespass was inadvertent and the result of the unmarked landfill boundaries and an inadequate access road. While this behavior of the City and its agents may constitute negligence, perhaps even gross negligence, it does not rise to the level of intentional and anticipated damaging, as provided by the first prong of the Angelle court's description of damages incurred "for public purposes."
However, as previously noted, damage need not be intentionally inflicted in order to be "for public purposes." As demonstrated in Angelle, damage for a public purpose "might be inflicted upon private property as a necessary result of the undertaking although the doing of the damage is unintentional and may not be foreseeable by the governmental agency." 34 So.2d at 326. In other words, even unintentional damage can be inflicted "for public purposes" if it is a "necessary consequence" of the public project. Id.; See, e.g., Florsheim, 201 So.2d at 155; Small, 589 So.2d at 1132; Wilson, 96-0015, 683 So.2d at 382.
Because we find that the City was not required to trespass upon plaintiffs' properties in order to dispose of the City's waste, we agree with the conclusion of both lower courts that this activity by the City was not a "necessary consequence" of the landfill operations. Though the purpose of this public project was to dispose of the refuse of the surrounding communities, an invasion of the plaintiffs' lands was not necessary to accomplish this end. There has been no indication that there was shortage of land upon which to dump the City's trash, which would have made an invasion of the plaintiffs' lands necessary in order to accommodate an overflow from the landfill (assuming that a land shortage would be an adequate excuse, which is not necessarily conceded). Rather, it appears that the City's inadvertent and unnecessary trespass upon plaintiffs' properties was simply the result of the negligence and carelessness of the City and its employees.[8] We reject the defendants' *554 argument that the trespassing occurred as part of the City's "regular" operation of the landfill.
Furthermore, we find this case distinguishable from our decision in Lyman, 500 So.2d at 390, in which R.S. 9:5624 was applied to a lawsuit arising from a public landfill operation. In Lyman, the plaintiff complained that the very existence of a public landfill caused him damage, a result obviously unavoidable by the defendant Town of Sunset. Unlike, for example, the inevitable annoyances that accompany the creation of a public landfill, or the damage caused by the unavoidable vibrations that accompany pile driving, the Patouts and Squirrel Run have alleged damage that need not have resulted from the City of New Iberia's landfill operations. The damage suffered by them is more akin to that of the broken fire hydrant in Perkins, 265 So.2d at 804, or the lost cattle in Miller, 173 So.2d at 840. In short, the damages suffered by the Patouts and Squirrel Run were not intentionally inflicted by the City, nor were they a "necessary consequence" of the operation of the landfill. Thus, we conclude that the damage was not incurred "for public purposes," and R.S. 9:5624 is not applicable.[9]

Applicability of R.S. 13:5111
Having concluded that R.S. 9:5624 is inapplicable to plaintiffs' lawsuits, we now turn to the defendants' alternative argument that this case is governed by the three year prescriptive period for takings, found in La. R.S. 13:5111. This statute provides in pertinent part:
[I]n a proceeding brought against the State of Louisiana, a parish, a municipality or other political subdivision or an agency of any of them, for compensation for the taking of property by the defendant, other than through an expropriation proceeding ... [a]ctions for compensation for property taken by the state, a parish, municipality, or other political subdivision or any one of their respective agencies shall prescribe three years from the date of such taking.
This argument is being raised for the first time before this Court, as the second assignment of error in the defendants' writ application and in their brief prior to oral argument. The issue of the applicability of this statute was not addressed by either the district court or the court of appeal.
Defendants now argue that the continued existence of refuse on plaintiffs' land constitutes a taking by the City of New Iberia, the compensation claim for which prescribes three years, they argue, from the date of the discovery of the taking. Defendants contend that "[t]he taking of property, by flooding or otherwise, without proper exercise of eminent domain, is not a tort but is considered an appropriation," citing Hawthorne v. Louisiana Dept. of Public Works, 540 So.2d 1261, 1262 (La. App. 3rd Cir.1989). Such takings are not subject to a continuing tort argument, they contend, so that the running of this three year prescriptive period was not affected or suspended by the City's continuing trespass. Much like the defendant State of Louisiana in Angelle, 34 So.2d at 321, the City of New Iberia and its insurers assert that the trespass upon plaintiffs' properties should not be considered a tort, but rather a compensable "taking" by a governmental entity, which is subject to the *555 three year prescriptive period found in R.S. 13:5111.
We disagree. The authority for the bringing of an action for compensation following a taking by a public entity is grounded in Article 1, Section 4 of the 1974 Louisiana Constitution. Section 4 provides in pertinent part that "[p]roperty shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit." (emphasis added).[10] We have recognized a landowner's right to compensation, pursuant to this constitutional provision, where a public entity has taken or damaged his property without proper expropriation proceedings. Williams v. City of Baton Rouge, 98-1981 (La.4/13/99), 731 So.2d 240; Reymond v. State Through Dept. of Highways, 255 La. 425, 231 So.2d 375 (1970). However, in such cases, we apply a three prong test in order to determine whether property rights have been "taken" under La. Const. Art. 1, Sec. 4. We must (1) determine if a right with respect to a thing or an object has been affected; (2) if it is determined that property is involved, decide whether the property has been taken or damaged in a constitutional sense; and (3) determine whether the taking or damaging is for a public purpose under Article 1, Section 4. Williams, 98-1981, 731 So.2d at 246-47; Constance v. State Through Dept. of Transp. & Development Office of Highways, 93-0813 (La.10/28/93), 626 So.2d 1151; State Through Dept. of Transp. & Development v. Chambers Investment Co., 595 So.2d 598 (La.1992).
We turn immediately to the third prong of the test for an Article 1, Section 4 taking. Determining whether a taking or damaging occurs "for public purposes" so as to trigger a right to compensation under Section 4 is similar to the question of whether damage is incurred "for public purposes" so as to trigger the application of R.S. 9:5624, described infra. Again, the language of Angelle is useful when interpreting the term "public purposes." We note that, in the instant case, the damages suffered by plaintiffs were not the "intentional or necessary consequence" of the City's landfill operation. Instead, the damage was the wholly unnecessary result of the neglectful and improper behavior of the City and its employees. Therefore, plaintiffs' damages were not incurred "for public purposes" as defined by this Court in Angelle. Because damage "for public purposes" is required before a compensable takings claim under Article 1, Section 4 of the 1974 Constitution can be urged, plaintiffs' claims, like the claims of the Angelle plaintiffs themselves, cannot be characterized as actions for compensation for property taken by the state. Thus, the prescriptive provisions of R.S. 13:5111, governing such takings, are inapplicable to this case.

Conclusion
Having found that neither R.S. 9:5624 nor R.S. 13:5111 are applicable to plaintiffs' actions, we conclude that this case is governed by the general delictual prescriptive period found in La. C.C. art. 3492. Because this resolution has settled the question that prompted our granting this writ and has disposed of both assignments of error raised by defendants in their writ application and brief preceding oral argument, we decline to address other issues discussed and resolved in the court of appeal opinion. Entergy Gulf States, Inc. v. Louisiana Public Service Commission, 98-CA-0881, p. 27, n. 26 (La.1/20/99), 726 So.2d 870, 887. Being in accord with the court of appeal's conclusion that the one year prescriptive period contained in La. C.C. art. 3492 governs plaintiffs' lawsuits and that R.S. 9:5624 is not applicable in this case, and likewise deeming R.S. *556 13:5111 to be inapplicable, we affirm the opinion and judgment of the court of appeal.

Decree
For the foregoing reasons, the judgment of the court of appeal in favor of plaintiffs is affirmed. The case is remanded to the trial court for further proceedings.
AFFIRMED; REMANDED TO DISTRICT COURT.
LEMMON, J., concurred and will assign reasons.
NOTES
[*] Traylor, J., not on panel. Rule IV, Part 2, § 3.
[1] The statute was amended in 1987 by Act No. 339, § 1 to read,

"When private property is damaged for public purposes any and all actions for such damages are prescribed by the prescription of two years, which shall begin to run after the completion and acceptance of the public works."
[2] Art. 3492 Delictual actions

Delictual actions are subject to a liberative prescription of one year. This prescription commences to run from the day injury or damage is sustained. It does not run against minors or interdicts in actions involving permanent disability and brought pursuant to the Louisiana Products Liability Act or state law governing product liability action in effect at the time of the injury or damage.
[3] Art. 3493 Damage to immovable property; commencement and accrual of prescription

When damage is caused to immovable property, the one year prescription commences to run from the day the owner of the immovable acquired, or should have acquired, knowledge of the damage.
[4] According to the trial judge, the renounced claims became subject to the ten year prescriptive period for personal actions. La. C.C. art. 3499. Thus, he reasoned that the prescriptive period for the pre-February 1981 claims would have run on February 24, 1992. The Patout suit was filed within this ten year period. While the Squirrel Run suit was not filed until 1993, the trial court found that the running of the ten year period had been interrupted as to Squirrel Run, at the latest, in January 1990, when Mayor Bobby Bodin met with a Squirrel Run representative and acknowledged the 1982 agreement.
[5] Plaintiffs have argued for the application of the shorter one year prescriptive period contained in La. C.C. art. 3492. Though it may seem counter-intuitive for the plaintiffs to favor a shorter prescriptive period, the logic behind their position becomes clear when we consider the fact that the continuing tort doctrine is an exception to general rules of prescription, providing that when the tortious conduct and resulting damages continue, prescription does not begin until the damaging conduct is abated. South Central Bell Telephone Co. v. Texaco, Inc., 418 So.2d 531 (La. 1982). Plaintiffs are aware that, for their claims to be viable, application of the continuing tort doctrine is likely necessary, as they discovered the City's trespass more than fifteen years before filing suit. However, a continuing tort argument is not available when claims are governed by the two year prescriptive period of R.S. 9:5624 for actions arising from damage to private property for public purposes. See, Lyman v. Town of Sunset, 500 So.2d 390, 392 (La.1987); Small v. Avoyelles Parish Police Jury, 589 So.2d 1132 (La.App. 3rd Cir.1991); LeBlanc v. City of Lafayette, 558 So.2d 259 (La.App. 3rd Cir.1990).
[6] This was the state of the law at that time. It was not until this Court's decision in Board of Commissioners of the Port of New Orleans v. Splendour Shipping & Enterprises Co., 273 So.2d 19 (La.1973), that tort suits against public entities and agencies were sanctioned. The 1974 Constitution would soon reflect this change in the law in La. Const. Art. 12, § 10(A), which states that "[n]either the state, a state agency, nor a political subdivision shall be immune from suit and liability in contract or for injury to person or property."
[7] Maturin also recalled pushing garbage to the side when the access road was not wet and muddy. Because a fire had burned parts of the landfill, he found it necessary to push garbage onto the land alongside the access road in order to exit the landfill with his equipment.
[8] We decline to address the question of whether negligence on the part of a public entity or its agents will always preclude the application of R.S. 9:5624, as some lower courts have held. Rather, we simply conclude that, in the case before us, the trespass upon plaintiffs' properties was not a necessary result of the City's landfill operations.
[9] We reject defendants' argument that the court of appeal erred in considering and focusing on the "proper operation" or "legitimate" actions that should have been taken by the City. In so doing, the court of appeal simply considered whether the trespass upon plaintiffs' lands was a necessary consequence of the landfill operations. Further, we reject defendants argument that such an approach will frequently require a full trial on the merits. As demonstrated by this case, a determination of whether damage was inflicted "for public purposes" can be made prior to trial, after a hearing on the issue of prescription, just as it might also be deferred until after trial.
[10] The precursor of this constitutional provision was Article 1, Section 2 of the 1921 Louisiana Constitution. Supra, page 549.