# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 15-459


**CHARLES HENRY DAVIS, ET UX.**

**VERSUS**

**SABINE PARISH POLICE JURY, ET AL.**


**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
ELEVENTH JUDICIAL DISTRICT COURT
PARISH OF SABINE, NO. 48,532
HONORABLE STEPHEN BRUCE BEASLEY, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

## DAVID KENT SAVOIE
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Ulysses Gene Thibodeaux, Chief Judge, John D. Saunders, and David Kent Savoie, Judges.


**EXCEPTION OF PRESCRIPTION DENIED; JUDGMENT AFFIRMED.**

**Charles D. Soileau**
**Attorney at Law**
**730 San Antonio Avenue**
**Many, LA 71449**
**(318) 256-0076**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Sabine Parish Police Jury**

**Edward P. Chevallier, Jr.**
**Attorney at Law**
**770 San Antonio Avenue**
**Many, LA 71449-3139**
**(318) 256-8858**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Sabine Parish Police Jury**

**Jeffrey H. Thomas**
**Thomas Law firm**
**P. O. Box 2177**
**Natchitoches, LA 71457-2177**
**(318) 352-6455**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
    **Charles Henry Davis**
    **Jan Nell Rawls Davis**

**T. Taylor Townsend**
**Attorney at Law**
**320 St. Denis Street**
**P. O. Box 784**
**Natchitoches, LA 71458-0784**
**(318) 352-2353**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
    **Charles Henry Davis**
    **Jan Nell Rawls Davis**

**SAVOIE, Judge.**

Defendant, Sabine Parish Police Jury ("the SPPJ") appeals the final judgment rendered by the trial court on January 20, 2015, following the October 15, 2014 trial on the merits wherein the trial court found in favor of Plaintiffs, Charles Henry Davis and Jan Nell Rawls Davis ("the Davises"). In this court, the SPPJ filed an exception of prescription. For the following reasons, we deny the exception of prescription and affirm the judgment of the trial court.

## FACTS AND PROCEDURAL HISTORY

This matter originally came for trial on September 24, 2013, at which time numerous exhibits were admitted into evidence by the Davises, the SPPJ and the Sabine Soil and Water Conservation District ("Sabine").[1] Following the granting of Plaintiffs' Motion for New Trial on June 17, 2014, this case came for trial a second time on October 15, 2014, nearly nineteen years after the original petition for damages was filed in 1995. At the second trial, the evidence from the 2013 trial was re-introduced, including objections, via stipulation of the parties, as well additional evidence in the form of deposition and live testimony.

In its Final Judgment signed January 20, 2015, the trial court recited the following facts:

> Plaintiffs CHARLES HENRY DAVIS and JAN NELL RAWLS DAVIS own an approximate 206.1 acre tract of land (hereinafter referred to as the "Davis tract") in Sabine Parish, Louisiana. Plaintiffs suffered damages resulting from excess water impounded on their property for extended periods of time that killed standing timber on their property. In addition, the impounded water continued to stand on the Davis tract for approximately seventeen (17) years. Plaintiffs also sustained the loss of use of their property due to the inability to grow timber on the subject property from 1995 until approximately 2012 as a result of impounded water.

---

[1]The Sabine Soil and Water Conservation District was made a defendant to the lawsuit by the Davises. The trial court did not find them liable, therefore, they are not a party on appeal.

Plaintiffs allege the Bayou Dupont Watershed Project, specifically Dam No. 2, was not draining properly due to clogging by weeds, trash, and debris, causing the water to back up and damage plaintiffs' property. This dam is situated on a plot of land which was owned by Richard and Patti Tannehill and Dennis and Laurie Bishop at the time of the filing of the petition and which is adjacent and contiguous to the subject property.

The trial court's January 2015 judgment does an excellent job of explaining the history and purpose of Dam No. 2. It states (footnotes omitted):

> Dam No. 2 was one of twenty-two (22) water retarding structures ("project dams") that were constructed in Sabine and Natchitoches Parish as part of the Bayou Dupont Watershed Project. The original sponsoring organization was the Upper West Red River Soil Conservation District. In 1968, this organization was divided into two entities: the Sabine Soil and Water Conservation District and the Natchitoches Soil and Water Conservation District. From the outset in the original agreement, the twenty-two (22) structures were to be maintained by the Police Juries of Sabine and Natchitoches Parish out of their normal operating funds.
>
> The subject dam was designed to have a permanent pool covering fifty-three (53) acres. It is two thousand eight hundred forty-five (2,845) feet long (slightly over one-half mile) and twenty-four (24) feet at its base. The subject dam was designed so that the water level would be maintained at an elevation of two hundred twenty-five (225) feet. The servitude entitled "Agreement for Flood Control Structures" that encompasses the Bishop–Tannehill tract was executed by C.E. Pattison on or about August 20, 1956.
>
> The subject servitude of this litigation encompassing the Davis tract was styled "Servitude for Impounding Water" and was executed by J.E. Wagley on or about August 24, 1956. The spillway crest elevation contour is two hundred thirty-eight and eight tenths (238.8) feet. The permanent or "sediment pool contour" elevation is two hundred twenty-five (225) feet (hereinafter, "permanent pool").
>
> The subject dam was designed so that any flood waters will flow through the draw down pipe when water exceeds the height of the riser elevation of two hundred twenty-five (225) feet, thus maintaining the permanent pool at two hundred twenty-five (225) feet. In a period of heavy rain, the permanent pool stage would increase

temporarily up to the elevation of the emergency spillway of two hundred thirty-eight and eight tenths (238.8) feet. When the elevation of the floodwaters exceeds two hundred thirty-eight and eight tenths (238.8) feet, the floodwaters would then flow out and over the two hundred (200) foot wide emergency spillway at one end of the earthen dam. The excess flood water between the riser elevation of two hundred twenty-five (225) feet and the emergency spillway crest of two hundred thirty-eight and eight tenths (238.8) feet would flow out through the draw down pipe. The flowage or temporary flood contour line of two hundred thirty-eight and eight tenths (238.8) feet was calculated based on a twenty-five (25) year flood event. In other words, once every twenty-five (25) years, water is likely to reach the emergency spillway crest elevation of two hundred thirty-eight and eight tenths (238.8) feet. The subject dam was also designed to drain the temporary impoundment area between the two hundred twenty-five (225) and the two hundred thirty-eight and eight tenths (238.8) foot elevations within a ten (10) day time period based on hydraulic data.

The permanent pool of water was designed to consist of only fifty-three (53) acres to be permanently inundated. No part of the Davis tract is included in the fifty-three (53) acres designated for the permanent pool. The fifty-three (53) acres under the pool was situated entirely on a portion of the adjacent Bishop-Tannehill Tract.

The judgment went on to discuss the maintenance and/or lack of maintenance with regard to Dam No. 2 and its effect on the Davis tract of land:

Over the subsequent decades, the drainage structures maintaining the pool level of the lake were not adequately maintained. The drainage structures of the subject dam were allowed to become clogged with debris resulting in the permanent pool increasing in size from its designed normal pool stage of fifty-three (53) acres to an unintended permanent inundation of much greater acreage that included approximately eight (80) acres of the neighboring Davis tract. The increased permanent pool elevation killed the standing timber on the Davis tract, including timber above the two hundred thirty-eight and eight-tenths (238.8) foot crest elevation, and created pockets (islands) of separate tracts surrounded by water that were separated and unreachable from the rest of the Davis tract.

The subject servitude covering the Davis tract was a flowage easement that would occasionally impound water above two hundred twenty-five (225) feet for a fairly short period of time and that the spillway would allow that water to recede back to the permanent pool levels "in approximately ten days." The subject dam was not designed to impound water on a permanent basis above the two

3

hundred twenty-five (225) foot level, but designed so that trees could still be grown above that level.

The SPPJ argues that the servitude over the Davises tract of land was meant to permit the *permanent* storage of water. The Davises disagree contending the purpose of the servitude is for the *temporary* flowage of water due to a heavy rain event. The trial court ultimately sided with the Davises that it is a *temporary* servitude, finding that the SPPJ and Sabine "failed to adequately maintain and operate the dam structures by routinely inspecting and unclogging the debris from the water control structures"; however, because the SPPJ cut Sabine's funding unilaterally, the trial court did not apportion fault to Sabine, finding that it was unreasonable to expect Sabine to continue maintenance without adequate funding. It further found that the failure of the Defendants "resulted in extensive flooding of the plaintiffs' property" which caused the damages at issue in this litigation. The trial court awarded the following damages to Plaintiffs: (1) $30,448.00 for loss of timber; (2) $132,800.00 for loss of use of the subject property; and (3) Court costs and attorney's fees in the total amount of $104,689.04.[2]

In addition to appealing the aforementioned judgment, the SPPJ also filed an exception of prescription at the appellate level alleging the Davises' claims are time barred under La.R.S. 9:5624. We will first discuss the merits of the exception.

## EXCEPTION OF PRESCRIPTION

Louisiana Code of Civil Procedure Article 2163 allows for the filing of an exception of prescription in the appellate court in the following instance:

> The appellate court may consider the peremptory exception filed for the first time in that court, if pleaded prior to a submission of

_____

[2]This amount was ordered at a separate hearing held on April 7, 2015, for the purpose of determining the amount of attorney's fees and court costs. Judgment was signed on May 5, 2015.

4

the case for a decision, and if proof of the ground of the exception appears of record.

> If the ground for the peremptory exception pleaded in the appellate court is prescription, the plaintiff may demand that the case be remanded to the trial court for trial of the exception.

The exception was filed prior to a submission of this case for decision, therefore, we must now determine if proof of the exception appears in the record.

The basis for the exception is found in La.R.S. 9:5624 which sets forth a prescriptive period of two years "when private property is damaged for public purposes." "The purpose of La. R.S. 9:5624 is to limit the exposure of the State and its political subdivisions to liability in connection with a public work to a reasonable period of time." *Avenal v. State*, 03-3521, p. 33 (La. 10/19/04), 886 So.2d 1085, 1108, *cert. denied*, 544 U.S. 1049, 125 S.Ct. 2305 (2005) (citing *Lyman v. Town of Sunset*, 500 So.2d 390 (La.1987)).

The supreme court in *Avenal* explained:

> "[N]ot every lawsuit for damages caused by a public entity or involving a public works project falls within the purview of R.S. 9:5624." *Estate of Patout v. City of New Iberia,* 98–0961 (La.7/7/99), 738 So.2d 544, 549. In order to fall under the statute, damage must be incurred "for public purposes." *Id.* Damage is incurred "for public purposes" when the damaging is "intentional or occurs as a necessary consequence of the public undertaking." *Id.* at 553. "[E]ven unintentional damage can be inflicted 'for public purposes' if it is a 'necessary consequence' of the public project." *Id.*

*Id.* at 1108-09.

In applying these principles to the present case, we must determine whether the damage sustained by the Davises' property was a necessary consequence of the Bayou Dupont Watershed Project, specifically Dam No. 2, such that it was inflicted for a public purpose; only then does the two year prescriptive period apply.

5

Guiding us in our analysis are numerous appellate decisions interpreting "necessary consequence." *See Estate of Patout*, 738 So.2d 544; *Avenal*, 886 So.2d 1085; *Lyman*, 500 So.2d 390; *Perkins v. Simon*, 265 So.2d 804 (La.App. 3 Cir. 1972). For example, in *Patout*, landowners filed suit for trespass because trash from a landfill overflowed onto their property. The supreme court found that, "Though the purpose of th[e] public project was to dispose of the refuse of the surrounding communities, an invasion of the plaintiffs' lands was not necessary to accomplish this end." *Patout*, 788 So.2d at 553. The court found that the trespass was due to the negligence of the City of New Iberia and refused to apply La.R.S. 9:5624.

Similarly, the Davises' property was flooded because of the SPPJ's negligence in not maintaining the dam structure, i.e., failing to inspect and unclog debris. We find this was not a "necessary consequence" of the public purpose and decline to apply La.R.S. 9:5624. As such, we find this case is governed by the one year prescriptive period found in La.Civ.Code 3492.

*Contra non valentem* "provides that prescription commences on the date the injured party discovers *or should have discovered* facts upon which his cause of action is based." *Sepulvado v. Procell*, 12-271, p. 5 (La.App. 3 Cir. 10/3/12), 99 So.3d 1129, 1135. The tract of land in question is undeveloped, and Mr. Davis testified that he rarely visited the property. He further testified that he hired a forestry consultant, Mr. Kelley, to manage his timber in 1995. In the summer of that year, Mr. Kelley informed Mr. Davis about the flooding of his property. Plaintiff argues this is when he discovered the damage to his property and, therefore, prescription should commence from this time. We agree. Suit was filed

November 17, 1995, well within the one-year prescriptive period. Based on the foregoing, the Exception of Prescription is denied.

## ASSIGNMENTS OF ERROR

On appeal, the SPPJ submits the following assignments of error:

1. The trial court erred in granting a new trial.

2. The trial court erred in admitting and considering parole evidence.

3. The trial court erred in admitting and considering hearsay evidence.

4. The trial court erred in holding that the SPPJ had assumed a duty, and the associated liability, to Plaintiffs to monitor a federal flood control watershed pond for flooding onto plaintiffs' property and breached a servitude agreement to which it was not a party.

5. The trial court erred in holding that the SPPJ was not immune from liability to Plaintiff under La.R.S. 9:2800(C).

6. The trial court erred in holding that the SPPJ violated La.Civ.Code art. 667 where it does not own or have proprietary control over the property on which the dam is located nor did it design or construct the dam.

7. The trial court erred in holding that SPPJ inversely condemned Plaintiffs' property where it neither designed nor built the dam and where claims for inverse condemnations are prescribed or preempted under La.R.S. 9:5624.

8. The trial court erred in finding the SPPJ liable for damages where Plaintiffs failed to prove that any damages were sustained to any portion of Plaintiffs' property that was not burdened by the servitude.

9. The trial court erred in finding the SPPJ 100% liable.

## ANALYSIS

### Motion for New Trial

This case originally came for trial on September 24, 2013. It was the Davises' belief that the only issue before the court was the interpretation of the servitude—whether it was temporary or permanent. They believed the issues of causation and damages were to be heard at a later date. If the court determined that

the servitude was a permanent one, as asserted by the SPPJ, then the second trial would not be needed. However, it is the SPPJ's position that liability was to be heard during that first trial, including causation. Because they did not prove liability during the 2013 trial, the SPPJ argues the Davises do not get a second bite at the apple.

On June 18, 2014, the trial court, in the interest of justice, granted the Davises' motion for new trial which the SPPJ argues was in error. In the judgment granting the motion for new trial, the trial court found there was a misunderstanding between the parties, stating:

> The trial record reveals that the agreement between counsel as presented to the court was that the trial be bifurcated: to adjudicate liability only and damages later, if necessary. However, there was a misunderstanding between counsel as to what the word "liability" encompassed. Plaintiffs had an understanding that it meant liability as to a breach of contract of the subject servitude. Defendants had the understanding that it meant ultimate liability under the duty-risk analysis for the subject flooding. There existed further confusion between counsel as to which part of the bifurcated trial causation would be argued.
>
> As there was a clear misunderstanding between counsel as to these crucial terms of the agreement to bifurcate the trial, the court concludes that there was no meeting of the minds as to how the trial would be structured resulting in the unintended consequence of counterintuitive procedural trial strategies that greatly prejudiced Plaintiffs and frustrated the court's function to impartially test and enforce law and jurisprudence in a fair and rational manner.

As we set forth in *Smith v. Alliance Compressors*, 05-855, pp. 6-7 (La.App. 3 Cir. 2/1/06), 922 So.2d 674, 678-79:

> Generally, new trials are granted in the interest of justice and are largely left to the discretion of the trial judge. *Succession of Robinson*, 186 La. 389, 172 So. 429 (1937). Trial courts are vested with the power to grant new trials on either discretionary or peremptory grounds. La.Code Civ.P. arts. 1972, 1973.
> . . . .

The discretionary grounds for granting a new trial are set forth in La.Code Civ.P. art. 1973, which states that a new trial may be granted at the discretion of the judge ". . . in any case if there is good ground therefor, except as otherwise provided by law." This has been interpreted to mean that "[w]hen the trial judge is convinced by his examination of the facts that the judgment would result in a miscarriage of justice, a new trial should be ordered." *Lamb v. Lamb*, 430 So.2d 51, 53 (La.1983) (citations omitted).

Appellate review of the grant or denial of a motion for new trial under La.Code Civ.P. arts. 1972 and 1973 is governed by the abuse of discretion standard, which prohibits this court from reversing the actions of a trial court unless an abuse of discretion can be demonstrated. *Davis v. Coregis*, 2000–475 (La.App. 3 Cir. 12/27/00), 789 So.2d 7, *writ denied*, 2001–292 (La. 3/30/2001), 788 So.2d 1192. The supreme court has also held, however, that appellate courts should not hesitate to reverse trial court judgments upon review of rulings on motions for new trial, if allowing the lower court judgment to stand would serve "to permit technical pleading rules to triumph over actual justice." *Lamb,* 430 So.2d at 54.

We find the trial court did not abuse its discretion in granting the Davises' motion for new trial. The June 2014 judgment made clear the trial court found that the misunderstanding between the parties amounted to a miscarriage of justice which could only be cured by granting a new trial. This assignment of error is without merit.

## October 15, 2014 Trial

### I. *Evidentiary Rulings: Parol and Hearsay Evidence*

The SPPJ contends that the 1956 grant of the servitude at issue is clear and unambiguous in that it grants a servitude for impoundment of water on the Davises' property. It is their position that the inquiry ends here. Generally, parol evidence is inadmissible "to negate or vary the contents of an authentic act or an act under private signature." La.Civ.Code art. 1848. However, "[i]f the written expression of the parties' common intent is ambiguous, parol evidence is admissible." *Mark A. Gravel Properties, LLC v. Eddie's BBQ, LLC*, 14-46, p. 5

(La.App. 3 Cir. 5/7/14), 139 So. 3d 653, 657.  The trial court found the contract to be ambiguous.  "Whether a contract is ambiguous or not is a question of law." *Indus. Roofing & Sheet Metal Works, Inc. v. J.C. Dellinger Mem'l Trust*, 32,048, p. 4 (La.App. 2 Cir. 8/20/99), 751 So.2d 928, 933, *writs denied*, 99–2948, 99–2958 (La. 12/17/99), 752 So.2d 166.  The appellate courts review questions of law de novo to determine whether the trial court was legally correct.  *Abushanab v. St. Charles Gaming Co.*, 12-155 (La.App. 3 Cir. 11/7/12), 103 So.3d 1197, *writs denied*, 12-2614, 12-2651 (La. 1/25/13), 105 So.3d 720 and 105 So.3d 723, respectively.

We must look to the wording of the servitude in order to determine if its intent is ambiguous.  The "Servitude For Impounding Water" states in pertinent part:

> 1. For and in consideration of the sum of <u>One & No/100 ($1.00)</u> and other good and valuable consideration, in hand paid by the Vendees to the Vendors, the receipt whereof is hereby acknowledged, the Vendors do hereby grant and convey unto the Vendees, their heirs, executors, administrators, and assigns, the right, privilege, and authority to use the lands hereinafter described for the storage of waters which may be impounded by a dam to be constructed on other lands:  Being in the part of SW1/4 of Section 6; N1/2 of NW1/4 of Section 7 Township 8 North Range 10 West, Sabine Parish, Louisiana.  Said dam being known as Floodwater Retarding Structure No. <u>two</u>.  Bayou Dupont Watershed Project, Public Law 566, 83rd U.S. Congress[] as shown on the maps or plats on file in the office of said Soil Conservation District, reference to which is made for all purposes.

This servitude is a voluntary or conventional servitude.  See La.Civ.Code arts. 654 and 697-774.  "Doubt as to the existence, extent, or manner of exercise of a predial servitude shall be resolved in favor of the servient estate."  La.Civ.Code art. 730.  The comments to La.Civ.Code 730 are instructive.  Comment (b) states:

> It is a cardinal rule of interpretation that, in case of doubt, instruments purporting to establish predial servitudes are always

10

interpreted in favor of the owner of the property to be affected. The rule incorporates into Louisiana law the civilian principle that any doubt as to the free use of immovable property must be resolved *in favorem libertatis*. See Domat, Les lois civiles dans leur ordre naturel, 1 Oeuvres de Domat 329 (ed. Remy 1828); 2 Toullier, Droit civil français 192 (1833). The Louisiana Supreme Court has repeatedly declared that "servitudes are restraints on the free disposal and use of property, and are not, on that account, entitled to be viewed with favor by the law." Parish v. Municipality No. 2, 8 La.Ann. 145, 147 (1853), cited with approval in Buras Ice Factory, Inc. v. Department of Highways, 235 La. 158, 103 So.2d 74 (1958). See also McGuffy v. Weil, 240 La. 758, 767, 125 So.2d 154, 158 (1960): "any doubt as to the interpretation of a servitude encumbering property must be resolved in favor of the property owner". The rule that the proper interpretation of an ambiguous instrument is that which least restricts the ownership of the land has been applied by Louisiana courts in a variety of contexts. See, *e.g.*, Whitehall Oil Co. v. Heard, 197 So.2d 672 (La.App.3rd Cir.), writ refused 250 La. 924, 199 So.2d 923 (1967) (determination of the question whether a landowner created a single servitude over contiguous tracts or a series of multiple interests).

Further, "[a] contract is considered ambiguous on the issue of intent when either it lacks a provision bearing on that issue, the terms of a written contract are susceptible to more than one interpretation, there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed." *Campbell v. Melton*, 01-2578, p. 6 (La. 5/14/02), 817 So.2d 69, 75. We find that, because there is no provision regarding intent, and more than one interpretation can be had, i.e., whether it is a temporary or permanent servitude, the servitude is ambiguous. Therefore, the trial court did not err when it considered parol evidence.

Turning briefly to the issue of hearsay evidence, the SPPJ contends the trial court erred in admitting and considering hearsay evidence regarding (1) intention of the parties and (2) other dam structures that were not a subject of this litigation. Specifically, it finds issue with Exhibit 8 and Exhibits 13-22. The Davises note that, at trial, the basis of the objections to these exhibits was relevancy rather than

hearsay. In fact, while the SPPJ titles the assignment of error as a hearsay objection, its discussion consists of a relevancy argument. Exhibit 8 is a letter signed by M.E.Winn, chairman of the Upper West Red River Soil Conservation District.[3] In it, he explains that the Bayou Dupont Watershed Project structures "will have a permanent pool and a temporary flood area, which will be flooded for a short period of time following heavy rains." Based on our ruling regarding parol evidence, we find Exhibit 8 relevant to determine the intention of the parties who negotiated the servitude. The trial court did not err in admitting this evidence.

Exhibit 13, it is argued, is inadmissible because it does not prove or disprove any fact at issue. It is a letter signed by the chairman of Sabine, Roweland Patrick, wherein he discusses complaints he has received about the Bayou Dupont Watershed Project, specifically issues concerning clogging. The letter is dated December 15, 1986. It goes on to discuss the responsibility of the SPPJ in "operating and maintaining the structures in working order." The subjects of Exhibits 14-22 are other dams and structures within the Bayou Dupont Watershed Project. The Davises argue that they are required to prove that the No. 2 dam has not been maintained. They further argue that "[e]vidence of the . . . routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice." La.Civ.Code art. 406. We agree that Exhibits 13 and 14-22 are relevant to the case at bar and find no error with the trial court's ruling.

*II. Standard of Review for Remaining Issues*

---

[3]The Upper West Red River Soil Conservation District was the original grantee of the servitude at issue.

The recent supreme court case of *Hayes Fund for First United Methodist Church of Welsh, LLC v. Kerr-McGee Rocky Mountain, LLC*, 14-2592 (La. 12/8/15), ___So.3d___, 2015 WL 8225654, at *4 (citations omitted), sets forth the applicable standard of review as follows:

> In all civil cases, the appropriate standard for appellate review of factual determinations is the manifest error-clearly wrong standard, which precludes the setting aside of a trial court's finding of fact unless that finding is clearly wrong in light of the record reviewed in its entirety. Thus, a reviewing court may not merely decide if it would have found the facts of the case differently. Rather in reversing a trial court's factual conclusions with regard to causation, the appellate court must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court's conclusion, and the finding must be clearly wrong.

### III. The SPPJ's Assumption of the Duty

The subject servitude was granted by the The Upper West Red River Soil Conservation District in 1956. In 1968, the conservation district was divided into two separate districts—the Sabine Soil and Water District and the Natchitoches Soil and Water District. The SPPJ argues that it never assumed the duty nor undertook responsibility to maintain the dam in question from any of these entities.

"[A]ssumption of duty arises when the defendant (1) undertakes to render services, (2) to another, (3) which the defendant should recognize as necessary for the protection of a third person." *Hebert v. Rapides Par. Police Jury*, 06-2001, p. 9 (La. 4/11/07), 974 So.2d 635, 643 (quoting *Bujol v. Entergy Services, Inc.*, 03–0492, p. 16 (La. 5/25/04), 922 So.2d 1113, 1129). The "Extract from the Minutes of the Police Jury of Sabine Parish, La." dated October 19, 1955 states, in pertinent part:

> Whereas, The Soil Conservation Service is now working on the Dupont Water Shed. That said Water shed is partly in Sabine Parish and partly in Natchitoches Parish. That it is necessary for the

13

Construction work or Dams be maintained after the completion of said water shed project. That it is estimated said Maintenance [ ] in Sabine Parish[ ] will be approximately $800.00 per year.

Therefore, Be it Resolved by the Police Jury of Sabine Parish, In Regular session convened[,] [t]hat the Parish of Sabine agrees to keep said construction or dams maintained. Said maintenance to be paid from Road District No. 17 or Ward 4 Funds.

The record indicates that the SPPJ complied with the obligation until the mid-1980s. At this time, funds were not provided for dam maintenance, and no maintenance was carried out. We find there is a reasonable factual basis for the trial court's conclusion that the SPPJ assumed the duty to maintain Dam No. 2 and we conclude the finding is not clearly wrong.

## IV. *Lack of SPPJ Immunity*

The SPPJ alleges that it is immune from liability under La.R.S. 9:2800(C). We disagree. The statute reads, in pertinent part:

A. A public entity is responsible under Civil Code Article 2317 for damages caused by the condition of buildings within its care and custody.

. . . .

C. Except as provided for in Subsections A and B of this Section, no person shall have a cause of action based solely upon liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so.

D. Constructive notice shall mean the existence of facts which infer actual knowledge.

While the Davises assert a claim under La.Civ.Code 2317, it is not their sole basis for liability. They also assert a claim under La.Civ.Code 667. In the case of *Branch v. City of Lafayette*, 95-298 (La.App. 3 Cir. 10/4/95), 663 So.2d 216, the

14

plaintiffs sued the City of Lafayette for water damage to their home due to a drainage problem within their neighborhood. The City of Lafayette's defense in *Branch* mirrors the SPPJ's contention—"that it cannot be held liable unless the plaintiffs prove that it had actual or constructive knowledge of the defect that allegedly caused the damage and a reasonable opportunity to remedy this defect pursuant to La.R.S. 9:2800[.]"[4] *Id.* at 219. We rejected that argument in *Branch* by finding "[t]he statute clearly states that this requirement of knowledge of defect and opportunity to remedy the defect only precludes a cause of action based solely upon La.Civ.Code art. 2317." *Id.* We found, because the plaintiffs in *Branch* pled a claim under La.Civ.Code 667, no immunity existed.

Based on the ruling in *Branch*, we find the SPPJ is not immune from liability under La.R.S. 9:2800(C). The trial court did not err in so ruling, and we find no merit in this contention.

## V. *SPPJ Liability under La.Civ.Code art. 667*

The SPPJ argues that it is not a "proprietor" under La.Civ.Code art. 667 and, therefore, it cannot be liable under said Article, which read: "Although a proprietor may do with his estate whatever he pleases, still he cannot make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him."[5] While the term "proprietor" is not defined, the Article references "his estate." The SPPJ contends that the dam and other structures are on the Tannehill tract of land and, therefore, are not part of the SPPJ's estate. This contention is without merit.

---

[4]*Branch* referenced La.R.S. 9:2800(B). The statute was subsequently re-written, and the subject matter previously found in Section (B) is now found in Section (C).
[5]This is the Article as it read in 1995, the time of the filing of the petition. It has since been amended.

15

Much case law abounds wherein a municipality is considered to be a "proprietor" for purposes of La.Civ.Code 667. *See Lombard v. Sewerage & Water Bd. of New Orleans*, 284 So.2d 905 (La.1973); *Hamilton v. City of Shreveport*, 180 So.2d 30 (La.App. 2 Cir. 1965), *writ denied*, 248 La. 700, 181 So.2d 399 (1966); *Branch*, 663 So.2d 216; *Romero v. Town of Welsh*, 370 So.2d 1286 (La.App. 3 Cir.1979); *Stanford v. Town of Bell*, 05-38 (La.App. 3 Cir. 6/1/05), 903 So.2d 1235, *writs denied,* 05-1684, 15-1709 (La. 1/9/06), 918 So.2d 1053 and 918 So.2d 1057, respectively. In *Hamilton*, 180 So.2d at 35, the appellate court adopted the reasons of the trial court, finding:

> We are in agreement with the trial judge's conclusion. Regardless of whether the cause of action arose out of Articles 2315 or 667 of the LSA-Civil Code, whenever a governmental agency engages in an undertaking with a public purpose and public benefit which directly results in a damaging of private property the 'or damaged' provision of the above quoted constitutional article is self-operating and creates a cause of action.

Further, in *Lombard*, 248 So.2d at 905, the supreme court dismissed the argument of the New Orleans Sewerage and Water Board, that it was not a proprietor under La.Civ.Code 667. The court stated "[w]e know of no exculpatory principle, except sovereign immunity, which relieves public bodies or municipalities of the obligation to compensate those whose property it has damaged in carrying on public works; and, since sovereign immunity is inapplicable here, there is none." *Id.* at 914.

The SPPJ counters the litany of case law by arguing that its position is distinguishable because it did not build, own, or operate the dam or other structures. However, we find that, based on the letters, minutes of meetings, and testimony, the SPPJ did undertake to maintain the No. 2 dam and did so for a long period of time. After a review of the pertinent case law, we find the SPPJ is a "proprietor"

16

for the purposes of La.Civ.Code art. 667 and that liability under La.Civ.Code art. 667 applies to this case.

"La.Civ.Code art. 667 requires a lesser finding than La.Civ.Code art. 2317 in that there does not have to be any defect or negligence; rather all that is required to impose liability are causation and damages." *Branch*, 663 So.2d at 220. We agree with the trial court when it states "[the SPPJ] failed to properly maintain the dam control structures in its charge located on the Bishop-Tannehill tract adjacent to the Davis tract." Further, "[the SPPJ's] failure to properly maintain them in a reasonable condition led to substantial flooding that resulted in damage to the Davis tract." The trial court did not err in finding the SPPJ liable under La.Civ.Code art. 667.

## VI. SPPJ Liability for Inverse Condemnation

In this assignment of error, the SPPJ re-asserts its argument that the claim has prescribed under La.R.S. 9:5624. We disagree as discussed above regarding the Exception of Prescription. We find no merit in this assignment.

## VII. Damages

The SPPJ alleges that the Davises failed to prove that any damages were sustained to any portion of Plaintiffs' property that was not burdened by the servitude. In doing so, it re-asserts its argument against allowing parol evidence. Again, the SPPJ argues that the servitude is clear and unambiguous and extraneous evidence was unnecessary. As we found above, the servitude is ambiguous, and the trial court did not err in considering parol evidence. The trial court specifically found that:

> (1) the subject servitude did not encompass the entirety of the Davis tract but only that portion of the Davis tract *at or below* the two hundred thirty-eight and eight-tenths (238.8) foot elevation,

17

and (2) the subject servitude at issue on the Davis tract at or below the two hundred thirty-eight and eight-tenths (23.8) foot elevation to the two hundred twenty-five (225) foot elevation is only a "flowage" or temporary servitude.

After reviewing the maps, plats, and letters in the record, we find there is a reasonable factual basis for the trial court's conclusion that the servitude was for temporary flowage during a major flood event, rather than a permanent easement. We do not find this conclusion to be clearly wrong.

*VIII.  Lack of Comparative Fault*

Finally, the SPPJ argues the trial court erred in assessing them with 100% of the fault. The SPPJ believes that the Davises, as the landowners, should be held accountable due to their failure to monitor their timber for damages. Comparative fault is applicable when the damage sustained is caused, in part, by the plaintiffs' own negligence or the fault of another party. La.Civ.Code art. 2323.

The trial court found:

Mr. Davis visited his undeveloped property, at considerable effort given its remoteness, approximately "once a year, a couple of times maybe…" In 1994, the year before suit was filed, he saw no water on his property. It was not until the following summer, June of 1995, that he noticed his property permanently under water. Mr. Davis then mobilized and after contacting various state agencies including the Sabine Parish Police Jury and the Sabine Soil and Water Conservation District, and getting no help, he filed suit in November of 1995.

Because Mr. Davis acted quickly and given "the considerable delay before any semblance of flooding relief could come to the Davis tract" despite Mr. Davis's efforts, the trial court found no fault on the part of the Davises. We find no error in the trial court's conclusion.

Sabine was the SPPJ's co-defendant at trial. The trial court determined that it was "unreasonable to expect the District to continue the sizable laborious and economic undertaking without continued funding by its co-sponsor, especially

since those funds were unilaterally cut off by the Sabine Parish Police Jury." Therefore, it found no fault on the part of the conservation district. We find there is a reasonable factual basis for the trial court's conclusion and do not find it to be clearly wrong.

## DECREE

For the foregoing reasons, the SPPJ's Exception of Prescription is denied. The trial court's judgment dated January 20, 2015, is affirmed. All costs are assessed against Defendant Sabine Parish Police Jury.

**EXCEPTION OF PRESCRIPTION DENIED; JUDGMENT AFFIRMED.**